AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case No: 4:25 MJ 8164 SRW |
| USB THUMB DRIVE (SUBJECT DEVICE #5), PRESENTLY STORED AT THE DEPARTMENT OF HOMELAND SECURITY, HOMELAND SECURITY INVESTIGATIONS, ST. LOUIS OFFICE, 1222 SPRUCE STREET, ROOM 7.303A, ST. LOUIS, MO 63103, WITHIN THE EASTERN DISTRICT OF MISSOURI. | ) ) ) ) ) ) | **FILED UNDER SEAL**<br><br>SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property

### SEE ATTACHMENT A

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the following is true and correct.

_____
*Applicant's signature*

Neal Gough, Special Agent, HSI
*Printed name and title*

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.**

Date: _____05/20/2025_____

_____
*Judge's signature*

City and state: St. Louis, MO

Honorable Stephen R. Welby, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: USB THUMB DRIVE, **(SUBJECT DEVICE #5),** PRESENTLY STORED AT THE DEPARTMENT OF HOMELAND SECURITY, HOMELAND SECURITY INVESTIGATIONS, ST. LOUIS OFFICE, 1222 SPRUCE STREET, ROOM 7.303A, ST. LOUIS, MO 63103, WITHIN THE EASTERN DISTRICT OF MISSOURI. | Case No.  4:25 MJ 8164 SRW<br><br>**FILED UNDER SEAL**<br><br>SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
FOR A SEARCH WARRANT**

I, Neal Gough, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – specifically, the electronic devices and the extraction described in Attachment A, all of which are currently in law enforcement possession – and the extraction from the electronic devices of electronically stored information described in Attachment B.

2.      I have been a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") since March 2021, and am currently assigned to HSI's St. Louis Office.  During my tenure as a Special Agent with HSI, I have completed approximately 1,080 hours of instruction and training at the Federal Law Enforcement Training Center.  Prior to my employment with HSI, I was employed as a municipal law enforcement officer for approximately 10 years.

3.      Throughout my law enforcement career, I have received training and gained experience regarding the use of cellular telephones and other electronic devices during and in furtherance of criminal activity. I have also received training and gained experience in searching cellular telephones and other electronic devices to ascertain evidence of criminal activity that may be present on such devices. As part of my training and experience, I have been involved in the application for and execution of numerous arrest and search warrants related to criminal activity, including search warrants for cellular telephones, laptop computers, and USB thumb drives. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by criminal offenders, including that they often use multiple electronic devices in connection with their criminal activity.

4.      The facts included in this affidavit come from my personal knowledge and observations, my training and experience, my collection of statements and information from witnesses and other law enforcement officers, and my review of records, documents, and other evidence obtained during this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts included in this affidavit, there is probable cause to believe that violations of federal law, including, but not limited to, a violation of Title 18, United States Code, Section 1349, conspiracy to commit wire fraud (the "Subject Offense"), has been committed by **Mohammad Saiful Islam** ("**Saiful**") and **MD Shakir Hossain** ("**Hossain**"), as well as other persons known and unknown.  There is also probable cause to search the property described in Attachment A for evidence, instrumentalities, and/or fruits of the Subject Offense, as described in Attachment B.

2

**LOCATION TO BE SEARCHED AND IDENTIFICATION OF THE DEVICES**

6.    The property to be searched consists of six electronic devices that members of the Onalaska (Wisconsin) Police Department seized from a vehicle occupied by **Saiful** and **Hossain** during a search of that vehicle incident to their arrest on or about October 24, 2024.

7.    Following the seizure of the devices, the devices were sent to the State of Wisconsin Department of Justice, Division of Criminal Investigation ("DCI"), located at the Madison Risser Justice Center Office, 17 W. Main St., Madison, Wisconsin 53707, for forensic examination pursuant to a state search warrant issued by the Circuit Court of La Crosse County, Wisconsin on or about October 30, 2024.

8.    During DCI's execution of the state search warrant, DCI obtained a full file system extraction for one of the six devices referenced above, which, out of an abundance of caution, is also part of the property to be searched.

9.    On or about April 25, 2025, the six electronic devices, as well as the extraction, were transported from DCI to the Onalaska (Wisconsin) Police Department, and then shipped to HSI's St. Louis Office. The devices and the extraction arrived to HSI's St. Louis Office on or about April 28, 2025, and have been stored there since then in anticipation of future forensic examination subject to obtaining a federal search warrant out of an abundance of caution.

10.    The devices and extraction are more particularly described as follows:

    a.    Apple iPhone, white in color ("**Subject Device #1**"),

    b.    Apple iPhone, blue in color ("**Subject Device #2**"),

    c.    Apple iPhone, purple in color ("**Subject Device #3**"),

    d.    Samsung cellphone, white in color ("**Subject Device #4**"),

    e.    USB thumb drive ("**Subject Device #5**"),

3

f.      MacBook laptop, blue in color ("**Subject Device #6**"), and

g.      Full file system extraction of Samsung cellphone, white in color, obtained and processed by State of Wisconsin Department of Justice, Division of Criminal Investigation (the "**Subject Extraction**").

**Subject Device #1**, **Subject Device #2**, **Subject Device #3**, **Subject Device #4**, **Subject Device #5**, and **Subject Device #6** are referred to collectively as the "**Devices**."  The **Subject Extraction** is referred to throughout as the **Subject Extraction**.

11.     The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data particularly described in Attachment B. The applied-for warrant would also authorize the review of the **Subject Extraction** for the purpose of identifying electronically stored data particularly described in Attachment B.

## **TECHNICAL TERMS**

12.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the telephone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include:  storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing

4

back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. A wireless telephone may have wireless connection capabilities such as Wi-Fi and Bluetooth.

b.	Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.	Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.	GPS: A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global

5

Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

f.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those

functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers or other electronic devices on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178).  Every computer or other electronic device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or other electronic device may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers or other electronic devices have static—that is, long-term—IP addresses, while other computers or other electronic devices have dynamic—that is, frequently changed—IP addresses.

h.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13.   Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://support.apple.com/en_US/specs/iphone, I know that an Apple iPhone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, as well as to access the Internet and various mobile applications.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used an electronic device.

**PROBABLE CAUSE**

**A.    The Indictment**

14.    On or about April 16, 2025, a federal grand jury sitting in the Eastern District of Missouri returned a First Superseding Indictment (the "Indictment") in Case No. 4:24-cr-00596-MTS-SPM, charging **Saiful**, **Hossain**, and others, including Khaled Ahmed ("**Ahmed**"), with the Subject Offense based on their participation in a fraud scheme that began no later than in or around July 2024 and that targeted elderly victims in numerous jurisdictions, including numerous elderly victims within the Eastern District of Missouri.

15.    The Indictment details that, as part of that scheme, conspirators initiated contact with the elderly victims through various means, including through phone calls and fraudulent electronic messages (such as "pop-up" messages and emails) that the elderly victims received on their computers and other electronic devices. The fraudulent electronic messages typically contained a phone number, along with false instructions designed to lure the elderly victims into calling the phone number to resolve completely fictitious issues that did not actually exist—issues such as that the elderly victims' financial accounts had been charged inadvertently, or that the elderly victims' computers needed antivirus software, or that the elderly victims' personal information had been compromised, among other things.

16.    After conspirators called the elderly victims or lured the elderly victims into calling them, they used false names and falsely portrayed themselves as being affiliated with a legitimate entity, such as a private company or a law enforcement agency, and oftentimes convinced the elderly victims to provide them with remote access to the elderly victims' computers, which on some occasions included access to the elderly victims' online banking information. Once conspirators had remote access to the elderly victims' computers, or had otherwise made contact

8

with the elderly victims, they misled the elderly victims into believing that they owed money to the conspirators.  For instance, on many occasions, conspirators falsely represented to the elderly victims that the elderly victims' financial accounts accidentally had been refunded too much money and that the elderly victims needed to withdraw cash from their financial accounts to repay the money. Because the elderly victims believed that they were dealing with actual representatives of legitimate entities and were unaware that they were being defrauded, the elderly victims complied with the conspirators' instructions by obtaining cash.

17.     Upon being informed by the elderly victims that they had obtained the cash, conspirators arranged for the elderly victims' cash to be picked up by couriers who worked on behalf of the conspiracy, either at the elderly victims' homes or at neutral locations, such as parking lots of gas stations and retail stores. To coordinate these fraudulent cash pick-ups, conspirators used encrypted messaging apps, such as WhatsApp and WeChat, to provide the couriers with instructions regarding the details of the cash pick-ups.

### B.     Saiful's Role as a Handler for the Conspiracy

18.     After **Ahmed** (who is charged in the Indictment) was identified as a courier for the conspiracy in or around October 2024, he began cooperating with law enforcement. As part of his cooperation, **Ahmed** disclosed that he was given instructions about "programs," including when and where to pick up money, by **Saiful**, whose phone number he identified as 971-50-317-2193. **Ahmed** also provided his phone to law enforcement and gave written consent for law enforcement to search his phone.

19.     I subsequently reviewed the contents of **Ahmed's** phone, including a WhatsApp text thread between **Ahmed** and the phone number 971-50-317-2193, which was saved under the contact name "Saiful البنجالى اللي وصلته Omaha Nebraska."

9

20.    That text thread, among others, corroborated **Ahmed's** statements that he was given instructions by **Saiful** about when and where to pick up money from elderly victims, including specific addresses and names. After I reviewed the contents of that text thread, I contacted law enforcement in numerous jurisdictions to inquire if they were aware of reported incidents that were consistent with the fraud scheme that I was investigating, and that occurred on or around the dates on which **Saiful** sent **Ahmed** the instructions or that involved the victims whose names **Saiful** sent to **Ahmed**.  Ultimately, through these steps, I was able to identify more than a dozen elderly victims of the fraud scheme who suffered more than $300,000 in combined losses between in or around August 2024 and October 2024.

21.    That text thread also contained a photo of **Ahmed** and the person who **Ahmed** identified as **Saiful** (first photo at the top of the next page, with **Saiful** on the righthand side of the photo).  Members of the investigative team utilized facial recognition technology with that photo, which ultimately led the investigative team to a public Instagram Threads account for "desh communications."  That account contained, among other things, a post of a boarding pass that showed flight information (flight AA4311 on August 20, 2024) and **Saiful's** name (Mohammad Saiful Islam) (second photo at the top of the next page).





22.     Members of the investigative team then utilized a Department of Homeland Security database, which confirmed that **Saiful** was a passenger on flight AA4311 on August 20, 2024.  Members of the investigative team also utilized another Department of Homeland Security database to locate a visa application for **Saiful**, on which his home phone number was listed as 971-50-317-2193 (the same one that **Saiful** used to communicate with **Ahmed**).

23.     After confirming **Saiful's** identify, members of the investigative team ran a criminal history inquiry on **Saiful**, which revealed that he (along with **Hossain**) had been arrested in Onalaska, Wisconsin on October 24, 2024.

**C.      The Seizure of the Devices During Saiful and Hossain's Arrest in Wisconsin**

24.     According to Incident Report 20-24-12992 from the City of Onalaska Police Department, on October 23, 2024, victim J.N. received an email that appeared to be from Microsoft regarding a purchase that victim J.N. had purportedly made. After receiving the email, victim J.N. contacted the phone number contained in the email and was informed by the person on the other end of the call that someone from Ohio had made the purchase and that it was cancelled. Victim J.N. was then advised by the person on the other end of the call that victim J.N.'s bank would

11

contact victim J.N. to resolve the issue.  Thereafter, victim J.N. received a call from someone claiming to be from victim J.N.'s bank, who falsely informed victim J.N. that $20,000 accidentally had been deposited into victim J.N.'s account.  Victim J.N. was instructed to withdraw the $20,000 in cash and told that an "agent" would pick up the cash from victim J.N.'s residence.  Based on victim J.N.'s suspicions that this was a scam, victim J.N. contacted law enforcement.

25.    The next day, October 24, 2024, victim J.N. further informed law enforcement that victim J.N. had been instructed to place the $20,000 cash in an envelope, and that victim J.N. was expecting a call with more instructions later that day.  Law enforcement then went to victim J.N.'s residence and listened to victim J.N.'s call with the suspect(s), who informed victim J.N. that someone would be coming to victim J.N.'s residence to pick up the money, and that someone would contact victim J.N. again later that day.

26.    Following that call, law enforcement setup surveillance in the parking lot of victim J.N.'s apartment complex and arranged for victim J.N. to provide the "agent" who came to pick up the cash with an envelope containing papers meant to simulate cash.  That afternoon, victim J.N. received another phone call, with the caller requesting that victim J.N. meet the agent outside the north entrance lobby of the apartment complex.  Shortly thereafter, law enforcement observed a Dodge Durango enter the parking lot, and further observed a male wearing a blue jacket (later determined to be **Hossain**) approach victim J.N. and accept the package before returning to the Durango.  Law enforcement then stopped the Durango, which was occupied by **Saiful** (in the driver's seat) and **Hossain** (in the passenger seat).

27.    After placing **Saiful** and **Hossain** under arrest, law enforcement searched the Durango, which contained, among other items, a Fox Rent A Car receipt showing that the Durango had been rented by **Saiful** in Chicago earlier that day, along with documents that appeared to be

ledgers, including a ledger listing dates (as early as July 10, 2024) and corresponding columns titled "received," "payout," and "cost." One column for July 24, 2024 indicated that a "program" was "cancelled," which was consistent with the terminology that **Saiful** used in some of his text message communications with **Ahmed** when planned fraudulent cash pick-ups did not go forward.

28.    During the search of the Durango, law enforcement also located and seized the **Devices**—a white iPhone (**Subject Device #1**) located on the passenger floorboard where **Hossain** was sitting, a blue iPhone (**Subject Device #2**) located near the driver's seat where **Saiful** was sitting, a purple iPhone (**Subject Device #3**) with a home screen displaying a photo of **Hossain**, a Samsung cellphone (**Subject Device #4**) with a home screen displaying a photo of **Saiful**, a USB thumb drive (**Subject Device #5**), and a MacBook laptop (**Subject Device #6**).

29.    Less than a week later, on October 30, 2024, Investigator Chad Marcon of the City of Onalaska Police Department obtained a state search warrant for the **Devices** from the Circuit Court of La Crosse County, Wisconsin. Those **Devices** were then transferred to DCI for forensic examination.

30.    By the time that **Saiful** and **Hossain** were indicted in the Eastern District of Missouri, DCI had obtained a file system extraction of **Subject Device #4** (the **Subject Extraction**) but had not obtained an extraction of any of the other **Devices**. In light of **Saiful** and **Hossain's** indictment in the Eastern District of Missouri, DCI discontinued its efforts to obtain extractions of the other **Devices**.

31.    Based on my participation in the instant investigation, as well as my training and experience investigating complex fraud schemes like the one described above, I know the following:

a.      That the type of scheme under investigation oftentimes takes months or more of planning and coordination before the participants begin carrying out the scheme.

b.      That members of the charged conspiracy used cellular telephones to communicate and share information with each other (including via messaging apps) in furtherance of the conspiracy.

c.      That individuals who are engaged in criminal activities—particularly fraud schemes like the one that **Saiful** and **Hossain** are charged with in the Indictment—commonly use cellular telephones to communicate with co-conspirators, keep track of co-conspirators' contact information, and keep a record of money owed by or to co-conspirators.  As a result, such individuals often store data on their electronic devices related to their illegal activity, which can include text messages and other messaging app "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and/or records of illegal transactions or the disposition of criminal proceeds.

d.      That while it is common for users to upgrade their smartphones and other electronic devices on a regular basis in the modern era, it is especially common for individuals attempting to conceal their criminal activities.  Due to this upgrade cycle, manufacturers of smartphones and other electronic devices have gone to great lengths to make the upgrade process easier for the user by automatically restoring old content to the new device. Although this process varies from manufacturer to manufacturer, ultimately when a new device assumes the role and functionality of the previous device, the messages, photographs, applications, communication

14

accounts, contact information, and other user data on the previous device is imported to the new device. This can happen even if the phone number or service provider is changed.  Thus, I believe that an examination of the **Devices** would contain evidence of the outlined violations of federal law even if the devices were newly purchased and not the specific devices utilized to conduct the criminal activity.

32.     Based on the foregoing, I respectfully submit that there is probable cause to believe that information associated with the **Devices** that is contained in data stored on the **Devices**, as well as information contained on the **Subject Extraction**, is likely to constitute evidence, instrumentalities, and/or fruits of the Subject Offense, including, but not limited to, GPS locations, photographs, and content of communications for the time period described in Attachment B.

33.     The **Devices** and the **Subject Extraction** are currently in the lawful possession of HSI.  Although the state search warrant authorized the forensic examination of the **Devices** (and the obtaining of the **Subject Extraction**), such that the United States might already have all necessary authority to examine the **Devices** and the **Subject Extraction**, I seek this additional warrant out of an abundance of caution to be certain that an examination of the **Devices** and a review of the **Subject Extraction** will comply with the Fourth Amendment and other applicable laws.

34.     The **Devices** and the **Subject Extraction** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Devices** first came into the possession of law enforcement.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the

15

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36.     In addition, there is probable cause to believe that things that were once stored on the **Devices** may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Digital information on a computer, mobile phone, tablet, or other similar electronic media can be transferred from one device to another and can be saved or stored on the device intentionally, *i.e.*, by saving an e-mail as a file, or by saving the location of one's favorite websites such as "bookmarked" or "favorite" files. Digital information can also be retained unintentionally, such as traces of the path of an electronic communication that may be automatically stored in many places (*e.g.*, temporary files or internet service provider client software, among others). Applications operating on electronic devices also store data about the device user, times and locations of when an application may be operated by the user, and other data related to the general use of the application (such as a photo, a message, a search, etc.)

c.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by

16

an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

d.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

e.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of their use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Devices** because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). In the case of computers, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the

17

attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about when the dates files were created and the sequence in which they were created.

b.      Information stored within a computer, cellular phone, and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

c.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

f.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

18

38.    *Nature of examination.*    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Devices** and a review of the **Subject Extraction** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the **Devices** to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

39.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Devices** and a review of the **Subject Extraction** described in Attachment A to seek the items described in Attachment B.

40.    Because this warrant seeks only permission to examine **Devices** and the **Subject Extraction** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

I state under the penalty of perjury that the foregoing is true and correct.

NEAL GOUGH
Special Agent
Homeland Security Investigations

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on this _____ 20th _____ day of May, 2025.

HON. STEPHEN R. WELBY
United States Magistrate Judge
Eastern District of Missouri

19

**ATTACHMENT A - 4:25 MJ 8164 SRW**

The property to be searched is particularly described as:

a.    USB thumb drive ("**Subject Device #5**");



**Subject Device #5** is currently located at HSI's St. Louis Office, 1222 Spruce Street, Room

7.303A, St. Louis, Missouri 63103, within the Eastern District of Missouri.

This warrant authorizes the forensic examination of **Subject Device #5** for the purpose of

identifying the electronically stored information described in Attachment B.

## ATTACHMENT B - 4:25 MJ 8164 SRW

1.      All records on **Subject Device #5** described in Attachment A that relate to violations of Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud) (the "Subject Offense"), and involve Mohammad Saiful Islam ("**Saiful**") and/or MD Shakir Hossain ("**Hossain**"), as well as other persons known and unknown, between January 1, 2024 to the present, including"

> a.      Evidence in any way relating to the Subject Offense;

> b.      Evidence in any way relating to wire fraud;

> c.      Evidence in any way relating to instructions and/or directions to pick up currency, including, but not limited to, dates, locations, directions, amounts of currency, and information to be conveyed to, or to be conveyed by, any person from whom the currency was to be picked up;

> d.      Evidence in any way relating to instructions and/or directions to deliver and/or send currency by any means;

> e.      Evidence in any way relating to any co-conspirators, including, but not limited to, communications with co-conspirators;

> f.      Communications between **Saiful** and **Hossain**, as well as communications between **Saiful** and/or **Hossain** and any co-conspirators;

> g.      Records and information that constitutes evidence concerning persons who collaborated, conspired, or assisted (knowingly or unknowingly) with the commission of the Subject Offense, or communicated about matters relating to the Subject Offense, including records and information that help reveal their identity or whereabouts;

h.      Records and information concerning payments received by or sent from **Saiful** and/or **Hossain**, or concerning debt owed by or to **Saiful** and/or **Hossain**, relating to the Subject Offense, including any ledgers or documents recording such information;

i.      Any other information concerning the Subject Offense;

j.      Records and information relating to travel by **Saiful** and/or **Hossain**;

k.      Records and information relating to communications in any way pertaining to any of the foregoing;

l.      Records and information that constitutes evidence of the state of mind of **Saiful** and/or **Hossain**, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, in any way pertaining to any of the foregoing;

m.      Files, items, records, stored voice mail, text, multimedia, and electronic mail messages in any way pertaining to any of the foregoing;

n.      Social media, communication software, payment software, or other applications and stored messages, multimedia, photographs, or other content contained therein in any way pertaining to any of the foregoing;

o.      Photographs, videos, or other stored media or files in any way pertaining to any of the foregoing;

p.      Evidence relating in any way to any email accounts or messaging apps used in connection with any of the foregoing;

q.      Call logs of incoming and outgoing telephone numbers (including names, addresses, or any other available identifying information);

r.      Address books and contact lists; and

s.      Calendars, including records of appointments or notes;

2.        Evidence of user attribution showing who used or owned **Subject Device #5** at the time the things described in this warrant were created, edited, or deleted, such as logs, contact lists, saved usernames and passwords, documents, and browsing history; and

3.        Any information recording **Saiful's**, **Hossain's**, and/or others' schedule or location from January 1, 2024 to the present.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.